UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| LISA JOHNSON,<br>    *Plaintiff*, | )<br>)<br>) |
|     *vs.* | )    2:10-cv-00268-JMS-MJD<br>) |
| SAM CRAIG, Sheriff of Lawrence County,<br>    *Defendant.* | )<br>) |

## **ORDER**

Presently before this Court is Defendant Sheriff Sam Craig's Motion for Summary Judgment, [dkt. 19], in this action brought under Title VII of the Civil Rights Act of 1964 by Ms. Lisa Johnson.

## I.
### STANDARD OF REVIEW

A motion for summary judgment asks that the Court find that a trial based on the uncontroverted and admissible evidence is unnecessary because, as a matter of law, it would conclude in the moving party's favor. *See* Fed. R. Civ. Pro. 56. To survive a motion for summary judgment, the non-moving party must set forth specific, admissible evidence showing that there is a material issue for trial. Fed. R. Civ. Pro. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

As the current version Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. Pro. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. Pro. 56(c)(1)(B). Affidavits or declarations must be made on per-

sonal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. Pro. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially the grant of summary judgment. Fed. R. Civ. Pro. 56(e).

The Court need only consider the cited materials, Fed. R. Civ. Pro. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them," *Johnson v. Cambridge Indus.*, 325 F.3d 892, 898 (7th Cir. 2003). Furthermore, reliance on the pleadings or conclusory statements backed by inadmissible evidence is insufficient to create an issue of material fact on summary judgment. *Id.* at 901.

The key inquiry, then, is whether admissible evidence exists to support a plaintiff's claims or a defendant's affirmative defenses, not the weight or credibility of that evidence, both of which are assessments reserved to the trier of fact. *See Schacht v. Wis. Dep't of Corrections*, 175 F.3d 497, 504 (7th Cir. 1999). And when evaluating this inquiry, the Court must give the non-moving party the benefit of all reasonable inferences from the evidence submitted and resolve "any doubt as to the existence of a genuine issue for trial . . . against the moving party." *Celotex*, 477 U.S. at 330.

## II.
### BACKGROUND[1]

Ms. Johnson began working with the Lawrence County Sheriff's Department in February of 2002 as a 911 dispatcher. [Dkt. 21-1 at 5.] In 2007, she submitted a request for an open position as a court security officer. [Dkt. 21-1 at 1.] To qualify for the position, applicants had to pass a written examination, meet with Sheriff Craig and Chief Deputy Tony Seidl, and pass a

---

[1] Unless noted otherwise, the facts that follow are not in dispute.

forty-hour pre-basic examination, which includes firearm and defensive tactic training. [Dkt. 21-1 at 7, 8.]

Ms. Johnson passed the written examination and met with Sheriff Craig and Chief Deputy Seidl to discuss the position's responsibilities. [Dkt. 21-1 at 7.] The position lacked an official job description. [Dkt. 28-1 at 4.] However, Sheriff Craig and Chief Deputy Seidl told Ms. Johnson at the meeting that a court security officer is responsible for checking bags, pockets, and purses of people entering the court through a metal detector. [Dkt. 21-1 at 7.] Other responsibilities include providing directions to visitors and assisting the courts, such as incarcerating guilty criminal defendants. [*Id*.] Ms. Johnson asserts, [dkt. 29 ¶1], and Sheriff Craig admits, [dkt. 31 ¶1], that Sheriff Craig intended the court security officer to also be a "Special Deputy." Special deputies wear a uniform, possess limited arrest powers, and carry a firearm. [*See* Dkt. 28-1 at 18.]

On June 25, 2007, Ms. Johnson obtained the position of court security officer and began working alongside the only other court security officer, Mr. Randy Haley. [Dkt. 21-1 at 7.] Sheriff Craig's predecessor appointed Mr. Haley to the position of court security officer. [Dkt. 21-1 at 7-8.] Mr. Haley carried a firearm and wore a uniform. [Dkt. 28-1 at 3.] Ms. Johnson never became a special deputy, so she was never provided with a uniform, a firearm, or arrest powers. [Dkt. 29 ¶10; dkt. 31 ¶10.] Ms. Johnson did, however, "regularly" ask about obtaining a uniform and firearm several times while working at this position. [*See* Dkt. 28-2 at 5.] As a court security officer, Sheriff Craig told her that she "was to sit at my desk and do nothing other than go through purses" of people entering the courthouse. [Dkt. 21-1 at 17.]

In November 2007, Judge Robbins complained to Sheriff Craig about his discomfort with the prospect of Ms. Johnson carrying a firearm because the judge was "concerned that

someone would take her firearm from her." [Dkt. 28-1 at 8.] Judge Robbins did not mention specific knowledge about any weakness of Ms. Johnson that caused his discomfort. [Dkt. 28-1 at 8.]

In July 2008, a year after becoming a court security officer, Ms. Johnson successfully completed the pre-basic training class and qualified for a firearm. [Dkt. 28-1 at 6.] According to Sheriff Craig, [dkt. 28-1 at 7], the concerns of Judge Robbins and the need to evaluate the viability privatizing court security caused the one-year delay. [Dkt. 31 ¶4.]

In addition to the pre-basic training, all Lawrence County Sheriff's Department employees who qualified to carry a firearm needed to complete a three-hour defensive tactics course training at Greg Lucas Martial Arts in Bedford, Indiana. [Dkt. 21-1 at 13.] Approximately six months after completing pre-basic training, around February 2009, Ms. Johnson took this defensive tactics course. [Dkt. 21-1 at 13; Dkt. 21 at 2 ¶13.] After the course, she asked Chief Deputy Seidl if she could return to attend the same training the next day. [Dkt. 21-1 at 13.] He consented. [Dkt. 21-1 at 14.] Ms. Johnson attended the training the next day, receiving pay for a full shift. [Dkt. 21-1 at 14.]

Soon after the two training sessions, Sheriff Craig and Chief Deputy Seidl called Ms. Johnson to Sheriff Craig's office and informed her she needed an additional six to eight weeks of semi-weekly training sessions, each lasting one hour, with Mr. Greg Lucas. [*Id*.] Sheriff Craig indicates that Greg Lucas Martial Arts approached him, concerned that someone could take a firearm away from Johnson, and because of Greg Lucas Martial Arts's concern; therefore, Sheriff Craig deemed that Ms. Johnson failed the defensive tactics training. [Dkt. 21-1 at 14; dkt 28-1 at 12.] Sheriff Craig and Deputy Chief Seidl indicated that they would re-evaluate her performance after several weeks of additional sessions to determine if she could carry a firearm.

[Dkt. 21-1 at 14.] Ms. Johnson testified that Sheriff Craig said he thought she lacked sufficient upper body strength, comparing her to Mr. Hadley, who was an amateur wrestler. [*Id.*]

During the additional training, Ms. Johnson remained a court security officer, received the same pay, and some compensatory pay for the training sessions. [Dkt. 21-1 at 16-17.] She completed some of the additional training sessions, injuring her shoulder and neck on January 15, 2010.[2] [Dkt. 21-1 at 19.]

During a meeting in March 11, 2009, Sheriff Craig told Ms. Johnson that "he had met with the Judges and he felt like until there was an intimidating male over in [her] position, they were not going to be happy." [Dkt. 21-1 at 11.]

On November 2, 2009, Ms. Johnson filed a charge of discrimination with the Equal Employment Opportunity Commission, alleging that she suffered disparate treatment from Sheriff Craig due to her gender. [Dkt 28-1 at 18.]

At some point, Sheriff Craig spoke with Judge Sleva and Judge Robbins regarding Ms. Johnson's duties. Sheriff Craig told the judges he disagreed with the judges' concerns about Johnson and advised them to provide for their own court security if they still felt unsafe. [Dkt. 29 ¶¶19-20; dkt. 31 ¶¶19-20.] Sheriff Craig told Ms. Johnson he was "on her side." [Dkt. 29 ¶17; dkt. 31 ¶17.]

Regarding Ms. Johnson's uniform, Training Officer Dana Wigley took Ms. Johnson to be measured for a uniform at the end of 2009 or early 2010. [Dkt 21-1 at 21.] Ms. Johnson was never given a properly fitting uniform due to incompatibility issues with the available male uni-

---

[2] Several days later, Ms. Johnson's doctor placed her on work restrictions. [*See* dkt. 21-3 at 1.] Sheriff Craig transferred her to a dispatch position because of the restrictions. [Dkt. 21-1 at 19.] As a dispatcher, Ms. Johnson's income remained the same as when she was a court security officer. [Dkt. 21-1 at 20.] On May 7, 2010, after her doctor removed the work restrictions, Sheriff Craig returned Ms. Johnson to the court security officer position. [*Id.*; Dkt. 21-4 at 5.]

form. [Dkt. 21-1 at 21-22.] Ms. Johnson was, however, measured for a bullet-proof vest, which never arrived. [Dkt. 21-1 at 22-23.] The male officers' vests arrived within a month or two of fitting. [Dkt. 21-1 at 22-23.]

On June 18, 2010, Johnson resigned her employment. [Dkt. 21-5 at 1.]

### III.
### DISCUSSION

#### A. Claims of Sexual Harassment

Although Ms. Johnson's Complaint includes allegations of "sexual harassment," [dkt. 1 ¶4], she has abandoned any such claim by failing to respond, with evidence or argument, to Sheriff Craig's assertion in his motion for summary judgment that she has no evidence of any sexual harassment, [*compare* dkt. 20 at 1, *with* dkt. 27]. *See Laborers' Int'l Union v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999) (collecting cases that arguments not presented in response to a motion for summary judgment are waived). Accordingly, the only claim that the Court need and will consider is Ms. Johnson's claim that she was subject to illegal sexual discrimination.

#### B. Relevant Period for Ms. Johnson's Sexual-Discrimination Claims

Before the Court can consider Ms. Johnson's sexual-discrimination claim, the Court must first determine the relevant period for the pattern of discriminatory treatment Ms. Johnson claims to have endured. Her Response accuses Sheriff Craig of "a pattern of [discriminatory] conduct during 2007-2010." [Dkt. 27 at 1.]

Sheriff Craig has, however, correctly objected that 2009 represents the starting point for her allegations of discriminatory treatment. [Dkt. 30 at 1.] In her Complaint, Ms. Johnson alleges sexual discrimination only "for several months during 2009." [Dkt. 1 ¶4.] She re-affirmed that period when working with Sheriff Craig to frame the case management plan, again identifying the discriminatory treatment as having occurred "over a period of several months during

2009." [Dkt. 11 at 1.] Additionally, subject to exceptions that Ms. Johnson does not argue apply, the fact that she filed her charge with the EEOC on November 2, 2009 limits the scope of her claims to discrimination occurring on or after January 6, 2009: the date 300 days before her charge. *See Laouini v. CLM Freight Lines, Inc.*, 586 F.3d 473, 475 (7th Cir. 2009) ("Because Indiana is a 'deferral state,' meaning it has a state agency with enforcement powers parallel to those of the EEOC, Laouini had 300 days from the alleged unlawful employment practice to file a timely charge." (citations omitted)). Allegations of discrimination during 2007 and 2008 in Ms. Johnson's Response brief are, therefore, outside the scope of this action.[3]

### C. Sexual-Discrimination Claim

Title VII makes unlawful all employment practices that "discriminate against any individual with respect to [ ] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a)(1) (2009). Plaintiffs can prove discrimination either directly or indirectly. Because Ms. Johnson makes no claim to the former, the Court will only discuss the indirect method.

To potentially succeed under that method, a plaintiff in a Title VII action must first establish a prima facie case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). As the parties agree, [*see* dkt. 20 at 2, dkt. 27 at 2], Ms. Johnson's prima facie case consists of the following four elements: (1) that she was a member of a protected class, (2) that she adequately performed her employment responsibilities, (3) that despite adequate performance, she suffered an adverse employment action, and (4) that she received different treatment

---

[3] The Court is aware that hostile work environments may constitute a single, continuing practice, so events that predate the 300-day look back period could be relevant. *See, e.g.*, *Bright v. Hill's Pet Nutrition, Inc.*, 510 F.3d 766, 768 (7th Cir. 2007) (citations omitted). Ms. Johnson has not argued that the same result should obtain here, where the only claim is for discriminatory treatment.

than similarly situated persons who were not members of the same protected class. *See Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 790 (7th Cir. 2007) (citation omitted). If she can make that showing, the burden then shifts to Sheriff Craig to come forth with a "legitimate, non-discriminatory reason" for his actions against Ms. Johnson. *Hill v. Potter*, 625 F.3d 998, 1001 (7th Cir. 2010) (citation omitted). And if Sheriff Craig can do so, then he will prevail unless Ms. Johnson can come forward with evidence that the proffered non-discriminatory reason is "a pretext for intentional discrimination." *Serednyj v. Beverly Healthcare*, LLC, 656 F.3d 540 (7th Cir. 2011) (citation omitted).

In his Motion for Summary Judgment, [dkt. 19], Sheriff Craig challenges only the third element of Ms. Johnson's prima facie case, claiming that the undisputed facts show that Ms. Johnson did not suffer an adverse employment action. Thus, he argues, Ms. Johnson's claim for sexual discrimination fails.

Ms. Johnson's Local Rule 56.1 statement identifies three asserted disputed issues of material fact, which the Court has consolidated into two for analytical convenience: (1) whether her job was changed to a "desk … merely checking purses" and (2) whether her working conditions were so intolerable as to have forced her to resign from her position?[4] [Dkt. 29 at 4.]

1. **Assignment to the Desk Duty**

While the Seventh Circuit has "defined adverse employment actions quite broadly, adverse actions must be materially adverse to be actionable, meaning more than a mere inconven-

---

[4] While Ms. Johnson's Local Rule 56.1 statement appropriately cites to the record, her Response contains multiple factual assertions that neither appear in that statement nor are supported with evidentiary citations. Those unsupported assertions cannot establish a genuine issue of fact. *See* Fed. R. Civ. Pro. 56(c)(1)(A); *Box v. A & P Tea Co.*, 772 F.2d 1372, 1379 n.5 (7th Cir. 1985) ("Of course arguments in briefs are not evidence…."). Additionally, the Court notes that Ms. Johnson's brief is also largely devoid of any citation to legal authority, putting her arguments on a very shaky footing.

ience or an alteration of job responsibilities." *Oest v. Illinois Dep't of Corrections*, 240 F.3d 605, 612 (7th Cir. 2001) (quotation omitted). Examples of adverse actions include "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibility, or a decision causing a significant change in benefits." *Lewis v. City of Chicago*, 496 F.3d 645, 653 (7th Cir, 2007) (citations omitted).

After reviewing the evidentiary material that the parties have cited here, the Court finds sufficient evidence of an adverse employment action regarding the refusal to ever convert Ms. Johnson's position of a court security officer into that of a special deputy. Ms. Johnson positions her claim as essentially one for a failure to promote. While Sheriff Craig argues that Ms. Johnson received all the amenities associated with her position as a court security officer, [*see* dkt. 30 at 3], Sheriff Craig does not dispute the significant desirability of a special deputy position over that of a court security officer. Sheriff Craig admits that he hired Ms. Johnson with the intention that she become "a Special Deputy, which means she would be armed, have limited arrest powers and be in a Deputy Sheriff's uniform." [Dkt. 29 ¶1; dkt. 31¶1.] He also admits that Ms. Johnson was never, in fact, made a special deputy, given the uniform, a weapon, or arrest powers, [dkt. 29 ¶10; dkt. 31 ¶10], despite believing her "fully capable" and "qualified" for special deputy status, [dkt. 29 ¶7; dkt. 30 ¶7]. That failure to promote Ms. Craig suffices for the purposes of summary judgment.[5]

### 2. Constructive Discharge

"A constructive discharge constitutes an adverse employment action. It occurs when the plaintiff shows that he was forced to resign because [the plaintiff's] working conditions, from the

---

[5] Because Sheriff Craig did not move for summary judgment with respect to the second or third steps of the burden-shifting inquiry, or any of the other pieces of Ms. Johnson's prima facie case, the Court will not discuss them.

standpoint of the reasonable employee, had become unbearable." *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010) (citation omitted). The Seventh Circuit has recognized two types of constructive discharges: resignations from "alleged discriminatory harassment," and resignations to prevent impending termination. *Id.* Here, Ms. Johnson only claims the first type of constructive discharge occurred. [*See* dkt. 29 at 4.]

The level of harassment required under the first branch of constructive-discharge theory requires "working conditions even more egregious than that required for a hostile work environment claim because employees are generally expected to remain employed while seeking redress, thereby allowing an employer to address a situation before it causes the employee to quit." *Chapin*, 621 F.3d at 679. For example, courts have found constructive discharge when employees reasonably feared for their personal safety from their harassers. *See e.g. Taylor v. Western & Southern Life Ins. Co.*, 966 F.2d 1188 (7th Cir. 1992) (involving supervisor who took a picture of himself holding a firearm to the head of the African-American plaintiff, later circulating the picture around the workplace making racist comments); *Brooms v. Regal Tube Co.*, 881 F.2d 412, 423-24 (7th Cir. 1989) (involving supervisor who grabbed the plaintiff and threatened to kill her). Likewise in *Pennsylvania State Police v. Suders*, the Supreme Court found constructive discharge where a resignation was prompted by, among other things, sexually obscene gestures made to the plaintiff "five-to-ten times per night" during the employee's tenure, pleas for help that went unanswered, and an arranged arrest of the plaintiff. 542 U.S. 129, 135-36 (2004).

Although Johnson's brief and list of material disputed facts are both less than clear, Ms. Johnson appears to claim four unbearable conditions within the applicable time period that, individually or collectively, made her workplace so unbearable as to have led her to resign: (1) that Sheriff Craig made Ms. Johnson undergo more training that other court security officers, [dkt. 27

at 4]; (2) that Sheriff Craig did not provide her with a uniform, firearm, or grant her arrest powers, [dkt. 27 at 4-5]; (3) that she suffered emotionally and had "medical concerns" because of her treatment, [dkt. 27 at 5, dkt. 29 at 4]; and (4) that she had career concerns from her failure to attain the status of special deputy. [Dkt. 29 at 4.]

### a. Extra Training

First, Sheriff Craig directed Johnson to undergo six to eight weeks of additional training. This training, however, does not rise to the level of an unbearable working condition. During the required additional training, Johnson remained a court security officer,[6] receiving full pay for her shifts at the courthouse, plus compensation while completing the training sessions. [Dkt. 21-1 at 16-17.] Ms. Johnson herself, prior to the six-to-eight week course, volunteered for additional defensive tactics training, [dkt. 21-1 at 13], indicating that the training had value in the marketplace and undermining an inference that a reasonable employee would deem extra training intolerable. Furthermore, far from decreasing the plaintiff's safety as in *Brooms* or *Taylor*, the purpose of Johnson's training was to make her safer at work. A reasonable employee would not feel compelled to resign solely because of being provided extra, paid training in defensive tactics.

### b. Equipment and Arrest Powers

Ms. Johnson's second claimed intolerable condition was a lack of a fitting uniform, arrest powers, and a firearm. [Dkt. 27 at 5.] While the circumstances may not have been ideal from Ms. Johnson's perspective, the parties agree that Sheriff Craig was working to ameliorate them. [Dkt. 29 ¶1; dkt. 31 ¶1, dkt. 29 ¶27 ("Craig advised Judge Sleva that he was going to keep Lisa in the court security position and that she would be armed and in uniform"); dkt. 31 ¶27.] Given

---

[6] Ms. Johnson temporarily moved to a dispatcher position after receiving an injury at one of the training sessions. However, the transition was temporary, and Ms. Johnson's pay did not change.

that Title VII law prefers that employees avoid self help to permit employers the opportunity to rectify the conditions (with the help, if necessary, of the EEOC mediators and/or a federal lawsuit), the Court cannot find that Ms. Johnson's situation rises to the high level required under constructive-discharge law. Indeed, Ms. Johnson herself was unable to find any case law that she claims even arguably stands to the contrary.

### c. Stress and Sleep Disorders

Next, Ms. Johnson's brief argues that her situation at work caused her stress and sleep disorders. [Dkt. 27 at 5 ("[Johnson] cried constantly, suffered [from] sleep disorder and received medical treatment for stress").] Her argument cannot, however, carry the day. Importantly, she has cited no evidence to support the existence of her symptoms; "counsel's argument is not evidence." *United States v. Harris*, 230 F.3d 1054, 1057 (7th Cir. 2000). *See also Montgomery v. American Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010) ("Before [a party] can benefit from a favorable view of evidence, [the party] must first actually place the evidence before the courts."). And, in any event, the focus of the present inquiry concerns the actions that Sheriff deliberately took and their effect on a reasonable employee, not on Ms. Johnson's subjective conditions. *See Monaco v. Fuddruckers, Inc.*, 1 F.3d 658, 661 n.4 (7th Cir. 1993) ("To prove a constructive discharge, Monaco must show that Fuddruckers deliberately made his working conditions so onerous or demeaning that he was effectively . . . fired in place and compelled to leave." (quotations, citations, and alterations omitted)). Ms. Johnson makes no argument that a reasonable employee who have suffered the same reaction (assuming any evidence exists to support counsel's argument), or that Sheriff Craig believed that Ms. Johnson would suffer that reaction.

### d. Career Concerns

Finally, Ms. Johnson argues that Sheriff Craig's refusal to let her become a special deputy caused her "career" concerns, which justified her resignation. [Dkt. 29 at 4.] Again, while arguing in her brief that her failure to be made a special deputy was hindering her advancement in law enforcement, she cites no evidence, not even any of her own testimony, to support that claim. [*See* dkt. 27 at 4.] Those unsupported statements must, therefore, be disregarded. *Montgomery*, 626 F.3d at 389.

### e. Totality of Johnson's Circumstances

None of Johnson's circumstances individually meets the high standard of an objectively unbearable working condition. Collectively, the they do not either. Unlike in *Suders*, *Brooms*, or *Taylor*, Ms. Johnson makes no claim that she was being subjected to derogatory words or conduct, or that her supervisors or co-workers were physically threatening her.[7] The Court finds that it was unreasonable for Ms. Johnson to have resigned before the EEOC process had finished. Accordingly, she has not established a constructive discharge.

## IV.
### CONCLUSION

For the above stated reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Sheriff Craig's Motion for Summary Judgment. [Dkt. 19.] The motion is denied with respect to Ms. Johnson's claim that the failure to make her a special deputy constituted illegal sex discrimination. The motion is granted in all other respects.

---

[7] To whatever extent Ms. Johnson may have felt more safe had she been armed in her position, she has pointed to no evidence in the record that she experienced any greater danger than when she first began working as a court security officer.

11/15/2011

                                            _____
Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only:**

Eric A. Frey
FREY LAW FIRM
freylaw@aol.com

Julie Joy Havenith
TRAVELERS STAFF COUNSEL OFFICE
jhavenit@travelers.com